IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

RON AND KATHY TEAGUE, on and
behalf of minor children, T.T.
and S.T.; DARRIN AND JULIE HARDY,
on and behalf of minor child,
C.H.; RHONDA RICHARDSON on and
behalf of minor child A.R.;
MARK AND JENNIFER DRAPER on and
behalf of minor children, A.D. and S.D.,            PLAINTIFFS

v.                          CASE NO. 10-6098

ARKANSAS BOARD OF EDUCATION;
JIM COOPER, BRENDA GULLETT,
SAMUEL LEDBETTER, ALICE
MAHONY, DR. BEN MAYS,
JOE BLACK, TOYCE NEWTON,
MIREYA REITH, AND VICKI SAVIERS,
in their official capacity;
MAGNET COVE SCHOOL DISTRICT;
KAREN SCOTT, DANNY LINAM,
LISA LOFTIS, KIM BRAY, AND
JACK RYNDERS, in their
official capacity;
THE ARKANSAS DEPARTMENT OF EDUCATION,            DEFENDANTS

CAMDEN FAIRVIEW SCHOOL DISTRICT
NO. 16 OF OUACHITA COUNTY;
EL DORADO SCHOOL DISTRICT #15,
UNION COUNTY, AR                                 INTERVENORS

## MEMORANDUM OPINION AND ORDER

Some 32 years after the Little Rock School integration
crisis made international headlines, the Arkansas Legislature
adopted a statute that was hoped would help in stemming
segregation in its public schools.  That statute included a
provision that would prevent its schools from becoming more

segregated while permitting students to transfer to schools outside their home districts.  It could be argued that no state has been scrutinized as much as Arkansas with respect to the integration and segregation of its public schools.  The legislation was intended to permit the free transfer of students within its school districts provided that the transfers did not adversely impact the racial make-up of the school district receiving the transferring students.  The legislature was no doubt properly motivated in its desire to end segregation, but the question that must be addressed is whether the legislation infringes on federally protected rights.  There was no litigation concerning this statute until litigation was filed in this Court.

Plaintiffs contend that this race-based restriction on the ability of students to transfer between school districts contained in the Arkansas Public School Choice Act of 1989, Arkansas Code § 6-18-206, is unconstitutional[1].  Specifically, Plaintiffs contend that Ark. Code Ann. 6-18-206(f) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Currently before the Court are Plaintiff's Motion for Entry of Judgment for Declaratory and Injunctive Relief and Brief in

---

[1] In addition, Plaintiffs originally alleged violations of Title VII of the Civil Rights Act of 1964 and the Illegal Exaction provision of the Arkansas Constitution (Art. 16, § 13).  (Doc. 1). According to the parties' Stipulation, these claims have been dismissed with prejudice.  (Doc. 77, ¶ 2-5).

Support (Docs. 69, 70), State Defendants' Motion for Summary Judgment and Brief in Support (Docs. 71, 72), Intervenors' Motion for Summary Judgment and Brief in Support (Docs. 74, 75) and related documents, responses and replies. The Court[2] heard oral arguments on these motions based on stipulated facts on April 16, 2012.

## I.   Background

This matter originated with a lawsuit filed in this Court on October 21, 2008. In *Hardy et al. v. Malvern School District et al.*, Plaintiffs/Parents filed suit against the Malvern School District, its board members, and the Arkansas State Board of Education ("ASBE"). No. 08-CV-6094, 2010 WL 956696 (W.D. Ark. March 16, 2010). The Court found that the Malvern School District was entitled to summary judgment because the undisputed material facts demonstrated that it played no role in the enforcement of Ark. Code Ann. § 6-18-206(f) against Plaintiffs and that Plaintiffs' claims against the members of the ASBE were barred by the doctrine of sovereign immunity. Based on these holdings, the Court did not reach the issues of whether Ark. Code Ann. § 6-18-206(f) is unconstitutional severable from the remainder of the Arkansas Public School Choice Act of 1989. The

---

[2] United States Magistrate Judge Barry A. Bryant, presiding.

instant action was filed on December 21, 2010, the matter is fully briefed and these issues are now before the Court[3].

## II.  Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  *Best Buy Stores, L.P. v. Benderson-Wainberg Associates*, 668 F.3d 1019, 1026 (8th Cir. 2012) (*quoting Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 416 (8th Cir. 2010)(*quoting* Fed.R.Civ.P. 56(c)(2)).  Here, the parties have submitted stipulations as to the claims, parties and facts, including census and school enrollment data, desegregation cases around the state and choice transfers in Arkansas.  Intervenors provided "expert"[4] reports from Dr. Jerry Guess, Camden Fairview School District Superintendent, Bob Watson, El Dorado School District Superintendent and Griffin J. Stockley, author and historian on race.  Because there are no issues of material fact in dispute, disposition by summary judgment is appropriate.

## III. Arkansas Public School Choice

---

[3] The parties agreed to substitute the current members of the Arkansas State Board of Education as defendants for any past members.  (Doc. 77, ¶ 9).

[4] The parties agreed and stipulated that these reports were admitted into evidence in lieu of live testimony to be used by the Court "for whatever they are worth." (Doc. 77, ¶158).

In Arkansas, children between the ages of 5 and 17 are required to attend either public, private, parochial or home school. Ark. Code Ann. § 6-18-201. The general rule in the State is that parents who send their children to public school must do so in the district in which they live. Ark. Code. Ann. § 6-18-202. There are exceptions to this rule.

If a parent works at least half-time at a public school in another district, their child may attend school in the district in which the parent works instead of the district in which they reside. Ark. Code Ann. § 6-18-203(b)(1)[5]. If, however, unforeseen circumstances result in a finding by a court that a school district is unlawfully segregated as a result of children attending school where their parents work, then the children must attend their resident district.

A high school student can attend up to 50% of his or her classes in another district if the courses they need to meet their educational objectives are not available in the resident district. Ark. Code Ann. § 6-18-204 (b)(2)[6]. A student may also attend a school outside their resident district if they are enrolled in an alternative education program, secondary area vocational center or community-based education program, as long as there is a compact between the resident and receiving

---

[5] 1983 Ark. Acts 822.

[6] 1983 Ark. Acts 14.

districts.  Ark. Code Ann. § 6-18-204(c).  These statutes permit a student to be directly enrolled in a non-resident school district.   In order to qualify for attendance under this provision, the student is required to file a projected course of study with his or her principal or school counselor and receive the receiving district's permission.  Ark. Code Ann. § 6-18-204(b)(3).  In addition, the resident district must pay tuition to the receiving district.  Ark. Code Ann. § 6-18-204 (b)(4).

Children who live at least fifteen miles from the school in their resident district but within seven miles of a school in an adjoining district may petition their resident district for a transfer to the adjoining district.  Ark. Code Ann. § 6-18-307(a)(1)[7].

A student may petition to transfer from one school district to another with the permission of both his or her resident and receiving school districts.  Ark. Code Ann. § 6-18-316[8].  This "legal transfer" of a student from one district to another places the responsibility for the education of the student on the receiving district and permits the receiving district to count these children in average daily membership for state aid money, but does not transfer local tax money from the resident district.   Tuition may be charged to either the parent or

[7] 1983 Ark. Acts 61.

[8] 1987 Ark. Acts 464.

resident district.   These transfers are reviewed every four years for renewal consideration.   Ark. Code Ann. § 6-18-316(d)-(g).   Legal transfers are prohibited when either the resident or the receiving district is under a desegregation-related court order or has ever been under such an order and when the transfer would negatively affect the racial balance of that district which is or has been under that order.   Ark. Code Ann. § 6-18-317(a)(1)-(2).   A district not currently under a desegregation-related court order but which has been under such an order in the past may apply for a waiver.   Ark. Code Ann. § 6-18-318[9].

Following the enactment of the previous Acts, the legislature created the Arkansas Public School Choice Act of 1989.   Ark. Code Ann. § 6-18-206[10].   The Arkansas Public School Choice Act sets out the findings and objectives of its drafters:

> The General Assembly finds that the students in Arkansas's public schools and their parents will become more informed about and involved in the public educational system if students and their parents or guardians are provided greater freedom to determine the most effective school for meeting their individual educational needs.   There is no right school for every student, and permitting students to choose from among different schools with differing assets will increase the likelihood that some marginal students will stay in school and that other, more motivated students will find their full academic potential.
>
> The General Assembly further finds that giving more options to parents and students with respect to where the students attend public school will increase the

---

[9] 1987 Ark. Acts 762.

[10] 1989 Ark. Acts 609.

> responsivenes and effectiveness of the state's schools
> since teachers, administrators, and school board
> members will have added incentive to satisfy the
> educational needs of the students who reside in the
> district.
>
> The General Assembly therefore finds that these
> benefits of enhanced quality and effectiveness in our
> public schools justify permitting a student to apply
> for admission to a school in any district beyond the
> one in which the student resides, provided that the
> transfer by this student would not adversely affect
> the desegregation of either district.

Ark. Code Ann. § 6-18-206(a)(2)-(4). However, the choice created by this section is subject to an important limitation: No student may transfer to a non-resident district where the percentage of enrollment for the student's race exceeds that percentage in the student's resident district. Ark. Code Ann. § 6-18-206(f)(1).

There are three exceptions to the limitation in Ark. Code Ann. § 6-18-206(f)(1). First, a transfer in violation of Subsection (f)(1) is permissible if the resident and non-resident school districts are in the same county and the racial composition of each district, as determined by the Arkansas Department of Education, remains within 25% of the county's overall minority percentage. Ark. Code Ann. § 6-18-206(f)(2). Second, a transfer is exempt if neither the resident nor the non-resident district has a minority percentage of the student's race greater than 10%. Ark. Code Ann. § 6-18-206(f)(3). Third, where the provisions of Ark. Code Ann. § 6-18-206(f) conflict

with a desegregation order or court-approved desegregation plan, the terms of the order or plan prevail over the choice statute. Ark. Code Ann. § 6-18-206(f)(4).

Before a student can transfer to another school district under the Arkanas Public School Choice Act of 1989, their parent or guardian must apply to the non-resident district by submitting an application, approved by the Department of Education, to the non-resident district's superintendent. Ark. Code Ann. § 6-18-206(b)(1)(A). The superintendent then has thirty days to notify the student's parents by letter whether the student has been accepted or rejected by the non-resident district, in accordance with pre-established standards. Ark. Code Ann. § 6-1-206(b)(1)(B), (b)(2)(A). A rejected application may be appealed to the Arkansas State Board of Education. Ark. Code Ann. § 6-18-206(b)(2)(B). The Department of Education is charged with monitoring each school district's compliance with the Arkansas Public School Choice Act of 1989 and developing rules and regulations for its proper implementation. Ark. Code Ann. § 6-18-206(f)(5)-(6). The Board has the authority to resolve disputes that arise with respect to the Arkansas Public School Choice Act of 1989's implementation and enforcement. Ark. Code Ann. § 6-18-206(g).

Fifteen years after the creation of the Arkansas Public School Choice Act of 1989, the Legislature continued to wrestle

with meeting its obligations to provide adequate public education. It then created the Arkansas Opportunity Public School Choice Act of 2004. Ark. Code Ann. § 6-18-227[11]. In the wake of the recent *Lake View*[12] litigation, the General Assembly found that a student should not be compelled against the wishes of the student, parent or guardian to remain in an underperforming school. Ark. Code Ann. § 6-18-227(a)(2)(B)(iii). The Arkansas Opportunity Public School Choice Act of 2004 allows students to transfer to a school that has been designated by the State as a school performing higher than that in which the student is currently enrolled or to which the student has been assigned.

The Legislature went further in 2011, when the Arkansas Opportunity Public School Choice Act of 2004 was amended to specifically state that the race or ethnicity of a student shall not be used to deny a student the ability to attend a school in the student's school district of choice under this section. Ark. Code Ann. § 6-18-227(d)(2)(B)[13]. Also amended at that time was Ark. Code Ann. § 6-18-227(e), which originally read: "The provisions of this section (Ark. Code Ann. § 6-18-227) and all student choice options created in this section are subject to

---

[11] 2003 Ark. Acts 35.

[12] *Lake View School District No. 25 v. Huckabee,* 351 Ark. 31 (2002).

[13] 2011 Ark. Acts 1147.

the limitations of Ark. Code Ann. § 6-18-206(d)-(f)."   The
section was amended to remove the obligation to comply with Ark.
Code Ann. § 6-18-206(f).   The current section reads:   "The
provisions of this section and all student choice options
created in this section shall comply with Ark. Code Ann § 6-18-
206(d)[14], (e)[15], and (i)[16] and shall not be subject to any other
limitation or restriction provided by law.   If any part of this
section conflicts with the provisions of a federal desegregation
court order applicable to a school district, the provisions of
the federal desegragation court order shall govern."   Ark. Code
Ann. § 6-18-227(e)(1)-(2).

## IV. Stipulated Facts

Plaintiffs were members of a group called "Parents for
School Choice."   (Doc. 77, ¶ 25).   The Teagues and Ms.
Richardson are residents of Hot Spring County, Arkansas (Malvern
School District), with minor children who attend Malvern School.
The Drapers and Hardys are residents of Hot Spring County,
Arkansas, (Ouachita School District), with minor children who
attend Ouachita School District. (Doc. 77, ¶¶ 28, 29).   Prior
to the 2010-2011 school year, Plaintiffs filed timely
applications to transfer their minor children to Defendant

---

[14] Ark. Code Ann. § 6-18-206(d) concerns course credits and graduation requirements.

[15] Ark. Code Ann. § 6-18-206(e) directs that for purposes of determining a school district's state equalization aid, the nonresident student shall be counted as a part of the average daily membership of the district to which the student has transferred.

[16] Ark. Code Ann. § 6-18-206(i) requires annual reports to the Equity Assistance Center.

Magnet Cove School District pursuant to Ark. Code Ann. § 6-18-206. (Doc. 77, ¶¶ 30, 37, 40, 47). Magnet Cove denied each transfer request. The minor children of the Plaintiffs are white. (Doc. 77, ¶ 54).

On June 30, 2010, Plaintiffs timely appealed Magnet Cove's decision to deny their applications for transfer to the State Board of Education. (Doc. 77, ¶ 60). By findings of fact, conclusions of law and order dated September 22, 2010, the ASBE denied the Plaintiffs' appeals[17]. The ASBE's decision contained the following conclusions:

> 24. ARK. CODE ANN. § 6-18-206(a)(5) generally allows any student in Arkansas to attend a school in a district in which the student does not reside. This general allowance is subject to the following provisions of ARK. CODE ANN. § 6-18-206(f):
> (1) No student may transfer to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in the student's race except in the circumstances set forth in subdivisions (f)(2) and (3) of this section;
> ***
> 27. The school choice applications of ...Richardson and [the Teagues] were properly denied by the Magnet Cove School District pursuant to the provisions of ARK. CODE ANN. § 6-18-206. The State Board does not have the authority to rule an Arkansas law unconstitutional. ARK. CODE ANN. § 6-18-206 remains in full force and effect and the State Board is bound by its provisions. Accordingly, the Richardson and Teague petitions are hereby DENIED. (Doc. 77, Ex. No. 24).

---

[17] Plaintiffs Teague and Richardson's appeals were denied because the students were not eligible for transfer under Ark. Code Ann. § 6-18-206(f). Plaintiffs Hardy and Drapers' appeals were denied because they did not seek transfer from their resident district (Ouachita School District) to the Magnet Cove School District. (Doc. 77, ¶¶ 47, 61). The Summary Judgment Motion is brought on behalf of Plaintiffs Teague and Richardson. (Doc. 69).

For the 2010-2011 school year, the percentage of white students in the Magnet Cove School District (95.11%) exceeded the percentage of white students in the Malvern School District (60.06%). Because the Teague and Richardson children are white, they were not permitted to transfer to Magnet Cove under the Arkansas Public School Choice Act of 1989. (Doc. 77, Ex. No. 11).

**VI.  The Parties' Positions**

Plaintiffs contend that while the Arkansas Public School Choice Act of 1989, Ark. Code Ann. § 6-18-206, provides a statutory right for students to transfer from one public school district to another in the State of Arkansas, Subsection (f)(1) limits this statutory right based on the race of the student who seeks to exercise it. Plaintiffs argue that this facial race-based limitation on the statutory right to transfer from one school district to another is discrimination based on race by the State of Arkansas, the ASBE and the school districts acting under the Arkansas Public School Choice Act of 1989. Plaintiffs argue that Subsection (f)(1) of this statute clearly violates the Equal Protection Clause of the 14th Amendment to the United States Constitution. (Doc. 70).

State Defendants[18] maintain that the Arkansas Public School Choice Act does not confer upon students the right to transfer; a student's right is to an equitable education.  Because of the limitations placed on the choice transfer laws, any alleged segregative effects are not caused by the State's laws.  Defendants argue that since the Arkansas Public School Choice Act of 1989 is narrowly tailored to the specific conditions sought to be remedied and the State provides other avenues for transfers which do not relate to the race of the student, it satisfies the Supreme Court's test for constitutionality.  The system is not only constitutionally permissible, they argue, but may also be required by the desegregation jurisprudence involving the State of Arkansas.  (Doc. 72).

Intervenors Camden Fairview and El Dorado School Districts and their respective board members contend that they are and will continue to comply with the laws of the State of Arkansas regarding the Arkansas Public School Choice Act of 1989.  The Intervenors and Magnet Cove School District[19] believe that Ark. Code Ann. § 6-18-206(f) is a valid limitation enacted by the

---

[18] In *Hardy*, we stated that the members of the Arkansas State Board of Education could not be sued in their official capacities unless and until Plaintiffs pursued their right to appeal the denial of their transfer applications.  The Plaintiffs have exhausted their administrative remedies and the ASBE members directly charged with enforcing the Arkansas Public School Choice Act are properly before the court.

[19] In *Hardy*, the Plaintiffs sued their resident school district, Malvern School District.  We granted Malvern's motion to dismiss, finding the constitutionality of Ark. Code Ann.  § 6-18-202 was unchallenged and that the school district was entitled to enforce the statute.  The proper school district defendant is non-resident Magnet Cove, the district which enforced Ark. Code Ann. § 6-18-206 and denied Plaintiffs' transfer requests.  The Magnet Cove defendants adopt as their own the Motion for Summary Judgment filed by the Intervenors.  (Doc. 81).

Arkansas   General   Assembly   as   an   integral   part   of   the legislature's attempt to allow school choice that would promote educational excellence while at the same time being sensitive to the need to eliminate the present effects of past intentional discrimination on the basis of race in the structure and delivery of public education in Arkansas.  (Doc. 75).

The parties all agree the Court must determine whether Ark. Code Ann. § 6-18-206(f) passes constitutional muster and, if not, whether Subsection (f) is severable from the remainder of the Arkansas Public School Choice Act of 1989.

## V.   Analysis

Arkansas has a complicated history with regard to race relations in general, and equal opportunity education in particular.  From resistance in the 1950s to minimum compliance in the 1960s, some parts of the state have fought integration even since the *Brown v. Board of Education of Topeka*[20] decision. This decision declared state laws establishing separate public schools for black and white students unconstitutional, finding that de jure racial segregation violated the Equal Protection Clause.  347 U.S. 483 (1954).  Arkansas is home to both the first public school in the former Confederate States of America to implement racial desegregation (Charleston) and the high

---

[20] 347 U.S. 483 (1954).

school which drew the nation's attention in 1957 when the state
National Guard was utilized to keep black students from entering
Central High School in Little Rock[21].

---

[21] After the first *Brown* decision in 1954, the Little Rock School Board issued a policy statement that it would comply with the Supreme Court's judgment to integrate public schools.  The NAACP petitioned the Board for immediate integration, and by 1955 the Board adopted the "Blossom Plan" (named after  Superintendent of Schools Virgil Blossom), which provided for gradual integration beginning in high schools starting in September, 1957 and lower grades over the next six years.  The gradual integration plan was upheld by federal court Judge John E. Miller who found that the Board had acted in "utmost good faith" in setting up its plan.  *Aaron v. Cooper,* 143 F. Supp. 855 (D.C. Ark. 1956).  In April, 1957, the Eighth Circuit upheld Justice Miller's decision.  *See Aaron v. Cooper*, 243 F.2d 361 (8th Cir. 1957).  On August 27, 1957, the segregationist Mother's League of Central High School filed a motion for a temporary injunction against integration at Central.  Two days later, Pulaski Chancellor Murray Reed granted the injunction, finding that integration could lead to violence.  Federal Judge Ronald Davies reversed the injunction and ordered the Board to proceed with its desegregation plan.

Under a federal court order to integrate, the Little Rock School District prepared to admit nine black students to Central High School.  The students, having attended all-black schools, volunteered to attend Central.  On September 2, 1957, The Governor of Arkansas announced in a televised speech that he would use the Arkansas National Guard to "prevent violence" and prohibit the students from entering Central.  On September 4, the "Little Rock Nine" tried to enter the school, but were turned away by the National Guard and denied entry for the next two weeks.  The Board requested a suspension of its desegregation plan, but Judge Davies denied the request.  On September 20, Judge Davies ruled that the governor had not used the Arkansas National Guard troops to preserve the law and ordered their removal from Central.  The troops were removed, leaving Little Rock police to maintain order as the Nine finally entered Central High School on September 23.  Following rioting by white parents and students outside the school, the Nine were secreted out of the back of the school.

The next day, based on his promise to uphold the Constitution by every legal means at his command, President Eisenhower ordered units of the U.S. Army's 101st Airborne Division into Little Rock and federalized the Arkansas National Guard.  On September 25, under federal troop escort, the Little Rock Nine walked into the classrooms of Central and completed their first day of school.   The Airborne Division left Little Rock in October and the federalized Arkansas National Guard troops stayed for the rest of the school year.  On May 25, 1958, Ernest Green, the only senior among the Little Rock Nine, became the first black graduate of Central High School.  It did not end there.

In the summer of 1958, Governor Faubus closed Little Rock's four public high schools in order to prevent further attempts at desegregation.  The city was divided into camps supporting and condemning segregation, using political, social and economic pressures to further the goals of each.  On September 27, 1958, Little Rock's citizens voted almost three to one against integration, leaving the schools closed for the entire school year to their 3,600 students.

The Little Rock public high schools reopened on August 12, 1959, with limited desegregation.  Integration involving substantial numbers of students would not occur until the 1970's.  Historian Taylor Branch once described the "Little Rock Crisis" as the most severe test of the Constitution since the Civil War.  The crisis spawned countless newspaper and magazine articles around the world and captured Americans' attention through a powerful new media tool:  television.   The experiences of the Little Rock Nine have been chronicled in biographies, autobiographies and documentaries and they are a critical part of the curriculum for Arkansas students of history.  In

In the follow-up decision to *Brown*, the Supreme Court held that States and school districts have an affirmative duty to eliminate the assignment of children to separate, racially-identifiable schools and must do so with all deliberate speed. *Brown v. Board of Education of Topeka*, 349 U.S. 294, 299 (1955). The question becomes, what are the limitations on a State's affirmative duty to purge our school systems of de jure and de facto discrimination?

The parties agree that the Teague and Richardson's children were denied the opportunity to transfer from the Malvern School District to the Magnet Cove School district solely on the basis of their race. (Doc. 77, ¶61). The Arkansas Public School Choice Act of 1989 as drafted by the Legislature on its face separates schoolchildren by race, the sole determining factor in their ability to transfer school districts under the Arkansas Public School Choice Act of 1989. The Equal Protection Clause prohibits the government from discriminating based on race unless the specific discrimination is narrowly tailored to serve a compelling government interest. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents*

1999, President Bill Clinton presented the Little Rock Nine with the Congressional Gold Medal, the nation's highest civilian honor.

Little Rock Central High School National Historic Site, www.nps.gov/chsc, site last visited April 30, 2012.

*Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 720 (2007), *quoting Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).  As a race-based classification, the statute must be evaluated under strict scrutiny.

One can assume that the limitation put forth in Ark. Code Ann. § 6-18-206(f) was inserted in the Arkansas Public School Choice Act of 1989 in response to and in light of this state's discrimination in its public K-12 educational programs, and with the primary intention of complying with the Supreme Court's mandates in the *Brown* cases.  The Arkansas Public School Choice Act of 1989 follows swiftly on the heels of decisions in both the Eastern District of Arkansas and the Eighth Circuit which held that a student transfer law that does not control for potential segregative effects is unconstitutional.  *Little Rock School District v. Pulaski County Special School District No. 1, et al.*, 584 F.Supp. 328 (E.D. Ark. 1984); 597 F.Supp. 1220 (E.D. Ark. 1984); 778 F.2d 404 (8th Cir. 1985)(en banc).  As a result of a comprehensive series of settlement agreements reached in 1988 and 1989 and adopted by consent decrees, the State remains obligated to this day to fund the Little Rock and Pulaski County School Districts' plans to remedy segregation violations. *Little Rock School Dist. v. Arkansas,* 664 F.3d 738 (8th Cir. 2011).

    **a.   Compelling Interest**

As for the constitutionality of the limitation, it is difficult to argue that there is no compelling interest at stake.   The Plaintiffs' and Defendants' motions are mirror images of one another.  Agreeing to stipulated facts and relying on the same Supreme Court precedent, the parties advocate for different legal conclusions.   The parties disagree particularly with respect to the applicability and impact of the Supreme Court's Decision in *Parents Involved in Community Schools v. Seattle School District No. 1 et al.*, 551 U.S. 701 (2007).  In *Parents Involved*, the Supreme Court considered voluntary efforts by school districts in Seattle, Washington, and Jefferson County, Kentucky, to achieve more racially integrated public schools.   In a 5-4 vote, the Court found both pupil assignment plans violated the Equal Protection Clause.

Although Seattle was never under a court-ordered desegregation plan, its school board adopted mandatory busing in 1978 as part of a settlement with the NAACP.  In the late 1980s that plan was replaced with one that allowed students to choose schools subject to certain race-based constraints.  In 1999, the plan classified students as either "white" or "nonwhite" and used that classification as a tie-breaker when too many students chose a particular school if that school had a ratio of white to nonwhite students that was outside of a certain range centered on the district's overall ratio.

Page 19 of 32

Parents Involved in Community Schools, a nonprofit organization of parents whose children were or could be in the future assigned under the Seattle plan, filed suit in the Western District of Washington.  The district court awarded summary judgment to the school district, finding that the assignment plan was consistent with state law and survived strict scrutiny under the Fourteenth Amendment's Equal Protection Clause. *Parents Involved in Cmty. Sch. V. Seattle Sch. Dist. No. 1,* 137 F.Supp.2d 1224 (W.D. Wash. 2001).  A panel of the Ninth Circuit reversed on the federal constitutional questions, holding that although attaining racial diversity and avoiding racial isolation are compelling interests, the plan was not narrowly tailored to achieve those interests.  *Parents Involved in Cmty Sch. V. Seattle Sch. Dist. No. 1*, 377 F.3d 949 (9th Cir. 2004).  The Ninth Circuit granted rehearing en banc, and overruled the panel, upholding the plan.  *Parents Involved in Cmty. Sch. V. Seattle Sch. Dist. No. 1*, 426 F.3d 1162 (9th Cir. 2005)(en banc).

Jefferson County, on the other hand, had been under a court-imposed desegregation order since 1975, but it had been declared unitary in 2001.  After the dissolution of the desegregation order, the school board adopted a school choice plan which allowed students to choose from schools near their homes subject to the receiving school's capacity, as long as

such assignment would not cause the school's percentage of black students to fall below 15% or rise above 50%. The mother of a Jefferson County student whose transfer request was denied because of the racial distribution requirement filed suit in the Western District of Kentucky.   The district court held that the Jefferson County plan was narrowly tailored to its compelling interest in maintaining racially diverse schools.  *McFarland v. Jefferson County Public Sch.*, 330 F. Supp.2d 834 (W.D. Ky. 2004).  In a one sentence, per curiam opinion, the Sixth Circuit affirmed the judgment of the district court.  *McFarland ex rel. McFarland v. Jefferson County Public Sch.*, 416 F.3d 513 (6th Cir. 2005)(per curiam).

In a consolidated opinion, the Supreme Court struck down both the Seattle and Jefferson County plans.  In the parts of his opinion that were supported by the majority of the Court, Chief Justice Roberts reasoned that since the plans of Seattle and Jefferson County involved racial classifications, they were in violation of the Equal Protection Clause unless they were narrowly tailored to achieve a compelling government interest. The Chief Justice reviewed Supreme Court precedent and determined that the Court had acknowledged two compelling interests in the context of public schools:  The first is the compelling interest in remedying the effects of past intentional discrimination.   *Parents Involved,* 551 U.S. at 720, *citing*

*Freeman v. Pitts*, 503 U.S. 476, 494 (1992).  The second compelling government interest identified by the Supreme Court is the interest in diversity in higher education upheld in *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003).  Because *Grutter* was expressly limited to higher education, we find, as the Supreme Court did in *Parents Involved*, that *Grutter* does not govern the present case.  551 U.S. at 725.

The underlying legal question in *Parents Involved* was whether a public school that had not operated legally segregated schools or had been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments.  *Parents Involved*, 551 U.S. at 711.  Based on that statement alone it could be argued (and Defendants so contend) that *Parents Involved* has no applicability to the case at bar.  The parties do not contest that Arkansas operated a dual school system that was not meaningfully segregated until the 1970s.  The parties produce no evidence that either the Malvern or Magnet Cove School Districts are or were in the past subject to a desegregation-related court order.  However, it may be virtually impossible to determine how many school districts in the State are operating at present under desegregation plans or orders.  (Doc. 72, p. 17).  A letter from the United States Department of Education Office for Civil Rights, Southern Division, dated September 2, 2005, does not identify Malvern

School District as operating under a Department or court-ordered desegregation plan. (Doc. 77, Ex. 53). Likewise a letter from the United States Commission on Civil Rights, Central Regional Office, dated October 30, 2006, does not identify Malvern as a school district which has been granted "unitary status" by a court. (Doc. 77, Ex. 52). The parties have identified no history of past intentional discrimination with respect to the Magnet Cove School District.

The Supreme Court has emphasized that "the Constitution is not violated by racial imbalance in the schools, without more." *Parents Involved* at 721, *quoting Milliken v. Bradley*, 433 U.S. 267, 280 (1977). Having identified the two compelling interests, the Supreme Court ultimately did not decide whether there was a compelling interest in the Washington and Kentucky cases; we likewise cannot find that the State's well-intentioned effort to avoid racial imbalance in public schools is not in pursuit of a compelling interest. Nonetheless, as in *Parents Involved,* the Arkansas Public School Choice Act of 1989 fails the second test of constitutionally because it is not narrowly tailored.

**b. Narrowly Tailored**

Defendants contend that the manner in which they have employed racial classifications is necessary to achieve their stated ends. The limitation expressed in Ark. Code Ann. § 6-18-

206(f) applies state-wide without regard to whether a resident or non-resident school district has a history of de jure or de facto segregation.  The blanket rule on inter-district transfers based solely on percentages of minority students in a school district directly contradicts the Legislature's stated goal of permitting students to choose from among different schools with differing assets that meet their individual needs.  Ark. Code Ann. § 6-18-206(a)(2).  As in *Parents* Involved, the plan in both design and operation of the Arkansas Public School Choice Act of 1989 is directed only to racial balance.  551 U.S. at 726.

The Department of Education created rules governing the guidelines, procedures and enforcement of the Arkansas Public School Choice Act of 1989.  (Doc. 77, Ex. 12).  Rule 8.01 provides that no student may transfer to a non-resident district where the percentage of enrollment for the student's race exceeds that percentage in the student's resident district. Rule 8.02 provides that the Department shall each year compute the minority/majority racial percentage(s) of the public school population for each county based on the October Annual School Report.  School districts may vary in the under-representation or over-representation of minority/majority students by a maximum of 25% of the difference in majority/minority percentages for the county as determined by the Department. Here, as in *Parents United*, the "racial balance the districts

seek is a defined range set solely by reference to the demographics of the respective school districts." 551 U.S. at 729.

To meet the definition of narrowly tailored, a school-choice plan must allow for an individualized review of each student to determine if his or her transfer would contribute to the overall goal of the district. A decision to deny transfer cannot be based solely on a student's race and must have consideration of their individual circumstances, otherwise the plan is unconstitutional.

The Arkansas Department of Education tracks student participation in choice transfers. The numbers kept by the department are not limited to transfers under Ark. Code Ann. § 6-18-206, but include students enrolled in a district under any transfer law. The numbers provided with the Affidavit of James Boardman show the number of students (by race) enrolled in school districts under the choice options. (Doc. 77, Ex. 34). For the entire state of Arkansas in the 2010-2011 school year, 15,682 students were enrolled in receiving districts under some form of choice transfer. (Ex. 43, Table 3). This represents 3.35% of the total elementary and secondary student body in the State. Of those participating in some form of choice transfer in the 2010-2011 school year, 75.97% (11,913 students) were white students and 17.18% (2,694 students) were black. For

comparison, there were 468,066 students enrolled in publicly funded education in the State. Roughly two-thirds (65.03% or 304,373 students) in the public schools in the State in 2010-2011 were white and 21.34% (99,862 students) were black. These numbers, according to Defendants, demonstrate that white students are participating in choice transfers at a significantly greater rate than their black peers. (Doc. 72).

The Intervenors submit the letter of Dr. Jerry D. Guess, Superintendent of the Pulaski County Special School District, which states that removing residence and race restrictions would rapidly result in many counties in Arkansas having a racially segregated public school system as white students "choice out" to "whiter" schools. (Doc. 77, Ex. 58).

Robert Watson, Superintendent of El Dorado School District, concludes that race trumps all other considerations, including quality of education, in his county among most white parents selecting a school district for their child to attend. He speculates that if the Arkansas Public School Choice Act of 1989 had not included a racial restriction, El Dorado would have very quickly lost its white students and become an overwhelmingly black school district. (Doc. 77, Ex. 59).

This fear of "white flight" does not, in and of itself, justify the overbroad restrictions on school transfer. "Those entrusted with directing our public schools can bring to bear

the creativity of experts, parents, administrators, and other concerned citizens to find a way to achieve the compelling interest they face without resorting to widespread governmental allocation of benefits and burdens of the basis of racial classifications." *Parents Involved*, 551 U.S. at 798 (2007)(Kennedy, J., concurring).

One cannot view the Arkansas Public School Choice Act of 1989 in a vacuum.  When it is studied as part of the larger body of legislation governing school attendance and assignment, it is clear that the Legislature has not only considered but enacted other methods of achieving its goals.  As discussed earlier, the other enrollment/transfer statutes already provide for exceptions when the resident or receiving school districts are or have been under a desegregation-related court order and the transfer in question would negatively affect the racial balance of the district.  *See* Ark. Code Ann. § 6-18-203(5), § 6-18-317.

Finally, some of the state's lawmakers themselves have determined that the limitation in Ark. Code Ann. § 6-18-206(f) may not pass the strict scrutiny test.  This is evidenced by a recent amendment to the Arkansas Opportunity Public School Choice Act of 1989 deleting the requirement of the race-based restriction with regard to transferring away from failing schools.  Ark. Code Ann. § 6-18-227 (d)(2)(B).

Page 27 of 32

The State must employ a more nuanced, individualized evaluation of school and student needs, which, while they may include race as one component, may not base enrollment or transfer options solely on race. Accordingly, the Court finds that Ark. Code Ann. § 6-18-206(f)(1) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and hereby permanently enjoins the State of Arkansas from applying Subsection § 6-18-206(f)(1) to transfer applications under the Arkansas Public School Choice Act of 1989. But for the fact that the unconstitutional provision is not severable from the remainder of the statute (discussed *infra*), the Court would order Defendants to permit the transfer of the Teague and Richardson children to the Magnet Cove School District.

## VI.  Severability

In light of the court's finding that Ark. Code Ann. § 6-18-206(f) is unconstitutional, the Court next has to address whether that subsection is severable from the Arkansas Public School Choice Act of 1989. If Ark. Code Ann. § 6-18-206(f) is found to be non-severable, the Arkansas Public School Choice Act of 1989 cannot survive Plaintiffs' challenges. The Camden and El Dorado School Districts contend that Subsection Ark. Code Ann. § 6-18-206(f) is not severable from the remainder of the Arkansas Public School Choice Act of 1989 and that as a result,

the Court must strike the entire Arkansas Public School Choice Act of 1989 due to the constitutional defect in subdivisions (f)(1)-(4).

Severability is a matter of state law." *Russell v. Burris*, 146 F.3d 563, 573 (8th Cir. 1998). "An act may be unconstitutional in part and yet be valid as to the remainder." *Ex Parte Levy*, 204 Ark 657 (1942). "In determining whether the invalidity of part of an act is fatal to the entire legislation, this court looks to "(1) whether a single purpose is meant to be accomplished by the act, and (2) whether the sections of the act are interrelated and dependent upon each other." *City of North Little Rock v. Pulaski County*, 332 Ark. 578, 584 (1998). "When portions of an act are mutually connected and interwoven, severance is not appropriate." *U.S. Term Limits, Inc., et al. v. Hill*, 316 Ark. 251, 268 (1995). "If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained." *Faubus v. Kinney*, 239 Ark. 443, 447 (1965)(*quoting Ex Parte Levy*, 204 Ark. 657 (1942)).

The Arkansas Public School Choice Act of 1989 makes clear that the Arkansas General Assembly's intent in passing the Arkansas Public School Choice Act of 1989 was to permit student

transfer in order to provide choices for parents and students and to foster better school performance--as long as those transfers do not adversely affect the desegregation of either district. Ark. Code Ann. § 6-18-206(a)(3)-(4).  The presence of Ark. Code Ann. § 6-18-206(f) demonstrates that the General Assembly, seriously considered the prospect that unlimited choice would defeat integration and create liability on the part of the state.  Ark. Code Ann. § 6-18-206(f) was implemented in order to prevent adverse effect on the efforts of desegregation, and may be construed as the Assembly's attempt to balance its efforts to serve the interest of students' choice and desegregation.

Severing Ark. Code Ann. § 6-18-206(f) from the remainder of the Public School Choice Act of 1989 would undermine the intent of the General Assembly.  Removing Ark. Code Ann. § 6-18-206(f) would leave uneffectuated the legislature's express statement that inter-district transfer is permissible "provided that the transfer by this student would not adversely affect the desegregation of either district."  Ark. Code Ann. § 6-18-206 (a)(4).  Further, severing Ark. Code Ann. § 6-18-206(f) would render the Arkansas Public School Choice Act of 1989's constraint on the ability of students to pursue inter-district transfer without any limiting authority.  The General Assembly sought to provide students with a choice of their school with an

express limitation that it did not adversely affect desegregation.  Ark. Code Ann. § 6-18-206(f) functions as the Arkansas Public School Choice Act's limiting agent and its removal would undermine the balancing act which it was implemented to serve.   Accordingly, Ark. Code Ann. § 6-18-206(f) is connected and interwoven with the Arkansas Public School Choice Act of 1989, and therefore, cannot be severed and Ark. Code Ann. § 6-18-206 is unconstitutional in its entirety.

V.   **Conclusion**

Ark. Code Ann. § 6-18-206(f)(1) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and that it is not severable from the Arkansas Public School Choice Act of 1989.   The State of Arkansas is enjoined from applying the Arkansas Public School Choice Act of 1989.   Plaintiff's Motion for Declaratory and Injunctive Relief (Doc. 69) is **GRANTED** as to the declaration of unconstitutionality of the Arkansas Public School Choice Act of 1989 and **DENIED** as to the injunctive relief sought by Plaintiffs.   Defendants' Motion for Summary Judgment (Doc. 71) is **DENIED**.   Intervenors' Motion for Summary Judgment (Doc. 74) is **DENIED.**

The Court fully expects this case to be appealed in view of the important issues presented in this case.

IT IS SO ORDERED this 8th day of June, 2012.

/s/ Robert T. Dawson_____
Honorable Robert T. Dawson
United States District Judge